## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MONA MENARD,                              :
    PLAINTIFF,                          :
                                        : CIVIL ACTION NO. 3:09cv1165(VLB)
                                        :
    v.                                  : MARCH 15, 2012
                                        :
BENJAMIN MORRIS                          :
    DEFENDANT.                          :

### ORDER GRANTING DEFENDANT'S MOTION TO VACATE JUDGMENT AND DISMISSING THE ACTION AB INITIO [DKT. #63]

Defendant Benjamin Morris has moved the Court pursuant to Fed. R. Civ. P. 60 (d) to vacate the Joint Stipulation for Judgment in favor of Plaintiff Mona Menard ("Menard"). *See* [Dkt. ## 35 and 36]. Defendant alleges that Menard was not aware that a lawsuit had been filed on her behalf and therefore never authorized the initiation of a lawsuit against Defendant Morris nor engaged Attorney Joanne S. Faulkner to represent her in the matter. On that basis, Defendant argues that the stipulated judgment must be set aside for fraud on the Court. For the following reasons, the Court grants Defendant's motion to vacate the stipulated judgment and dismisses the action *ab initio*.

### Background

On July 23, 2009, Attorney Faulkner filed a complaint on behalf of Menard seeking relief for Defendant's alleged violation of the Fair Debt Collection Practices Act ("FDCPA") 15 U.S.C. § 1692. *See* [Dkt. #1]. On September 3, 2010, the parties filed a joint stipulation for judgment in the amount of $1,001 and agreed that attorney's fees were to be decided by the Court upon application.

1

*See* [Dkt. # 34].  On September 10, 2010, the Court approved the stipulation and judgment was entered in favor of Mona Menard against Benjamin Morris.  See [Dkt. ## 34 and 35].  Defendant tendered payment in satisfaction of the judgment to Attorney Faulkner.

On September 22, 2010, Attorney Faulkner filed a motion for attorney fees. [Dkt. #37].  Defendant objected to Attorney Faulkner's fee application on the basis that the fees sought were incurred after Defendant repeatedly offered to settle the matter at its inception.  *See* [Dkt. #39].   On October 13, 2010, Defendant moved to reopen and extend the discovery deadline to permit discovery regarding Attorney Faulkner's fee application. *See* [Dkt. #41]. On April 7, 2011, the Court granted the Defendant's motion to conduct discovery.  *See* [Dkt. #45].   On August 23, 2011, the Court denied Plaintiff's motion for attorney fees without prejudice to refiling with more thorough briefing on the issue of whether Plaintiff's refusal to settle was in bad faith. See [Dkt. # 60].  On August 27, 2011, Attorney Faulkner renewed her motion for attorney fees.

On September 14, 2011, Defendant moved to vacate the Joint Stipulation for Judgment on the basis of fraud asserting that during her deposition Menard testified that she did not engage Faulkner to represent her, did not know suit was filed on her behalf, did not authorize settlement of the suit and did not receive settlement proceeds.  *See* [Dkt. #65].  On January 9, 2012, the Court held an evidentiary hearing to determine whether Plaintiff Menard had engaged Attorney Faulkner to represent her and bring suit against Defendant Morris for his alleged FDCPA violation.   See [Dkt. #79].

2

Defendant had issued a subpoena to Menard to testify at the evidentiary hearing.  Menard failed to appear at the hearing.  Attorney Faulkner indicated at the hearing that Menard was unavailable, she did not intend to call Menard to testify and that she believed Menard was not in good enough health to testify.  Attorney Faulkner also objected to the subpoena issued to Menard on the basis that there was not an appropriate witness fee.  Since the Defendant could not secure Menard's attendance at the hearing or she was unavailable, the Court allowed Defendant to introduce Menard's deposition testimony into evidence pursuant to Fed. R. Evid. 804 and Fed. R. Civ. P. 32(a)(4).[1]

During the evidentiary hearing, Attorney Faulkner objected to the introduction of Menard's deposition testimony on the basis of the interpreter.  Defendant argued that Attorney Faulkner had waived the objection and should not be allowed to assert it months after the deposition had concluded.  During discovery, Defendant had scheduled Menard's deposition for April 21, 2011.  On the day of the deposition, Defendant learned that Menard did not speak English and was a native Haitian Creole speaker.  Attorney Faulkner had neither informed Defendant of the language barrier nor arranged for an interpreter to enable her

---

[1] Federal Rule of Civil Procedure 32 prescribes the use of deposition transcripts in court proceedings, stating in subsection (a)(4): "A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: (A) that the witness is dead; (B) that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition; (C) that the witness cannot attend or testify because of age, illness, infirmity, or imprisonment; (D) that the party offering the deposition could not procure the witness's attendance by subpoena."  Fed. R. Civ. P. 32(a)(4).

client to respond to questions posed to her at her deposition.  Defendant obtained the services of an interpreter within hours of learning that Menard did not speak English and the deposition commenced that same day.  Attorney Faulkner did not object or challenge the qualifications of the interpreter during the deposition.  Only at the end of the deposition, did Attorney Faulkner question the interpreter's credentials.

The Court reserved judgment on the objection Attorney Faulkner raised during the evidentiary hearing and ordered the parties to brief by January 16, 2012 the merits of the objection to the interpreter's qualifications and whether Attorney Faulkner had waived the objection.  On January 13, 2012, Attorney Faulkner moved for an extension of time until January 27, 2012 to brief her objection to the interpreter's qualifications and the Court denied her motion.  *See* [Dkt. ##82 and 83].  On January 23, 2012, Defendant filed a brief in support of his argument that the objection had been waived.  *See* [Dkt. #85].  To date, Attorney Faulkner has not submitted a brief regarding her objection to the interpreter's qualifications.

### Objection to Interpreter's Qualifications

On the day of the Mona Menard's scheduled deposition, Defendant learned that Ms. Menard did not speak English and that the services of a Haitian Creole interpreter would be needed to conduct the deposition.   Defendant then obtained that same day an interpreter so that the deposition could proceed as scheduled.

Prior the commencement of the deposition, Defendant's counsel Attorney Rubin asked Attorney Faulkner if the interpreter was acceptable to Attorney

4

Faulkner.  *See* **Def. Ex. A, Menard Dep. at p. 11.  Attorney Faulkner asked the interpreter service who was providing the interpreter several questions.  Attorney Faulkner asked if the interpreter was a native Haitian Creole speaker and how long had the interpreter been in the United States.   Attorney Faulkner then asked that the interpreter bring his resume or the interpreter service fax his resume for her review.  *Id.* at 12-13.**

**Attorney Faulkner did not personally question the interpreter regarding his qualifications and credentials or ask for his resume prior to the commencement of Mona Menard's deposition.  After the deposition concluded, Attorney Faulkner stated that "we did not go over the interpreter's qualifications" and asked for the interpreter's resume.  *Id.* at p. 30.  The interpreter did not have his resume with him and promised to provide a copy.  *Id.*  Attorney Faulkner then asked from "whereabouts" in Haiti was the interpreter from.  *Id.* at 31.  Attorney Rubin then objected to Attorney Faulkner's line of questions arguing that the time for her to inquire as to the interpreter's qualifications had passed.  *Id.*  Attorney Faulkner responded to Attorney Rubin that they had agreed to allow her to inquire into the interpreter's qualifications.   Attorney Rubin argued that Attorney Faulkner had failed to inquire as to the interpreter's qualifications when the deposition commenced and therefore Attorney Faulkner "chose not to avail [her]self of that opportunity."  *Id.* at 32.   In response, Attorney Faulkner stated that "you started in without waiting for me."  *Id.*  Attorney Faulkner then asked that the "record will show that I have been prevented from asking essential questions to qualify –" and Attorney Rubin then asked that the "record will reflect that Attorney Faulkner**

did not avail herself of an opportunity to perform, in essence, a voir dire, or to inquire as to the qualifications of the interpreter prior to his interpreting." *Id.* at 33.

Defendant has argued that Attorney Faulkner has waived any objections to the interpreter's qualifications by not questioning or challenging the interpreter's qualifications prior to the commencement or during the deposition.   Defendant also argues that Attorney Faulkner has further waived her objection by not responding to the Court's order requiring the parties to brief this issue after the evidentiary hearing.

Federal Rule of Civil Procedure 32 governs the use of depositions in court proceedings.  Rule 32(d) governs when objections to depositions have been waived.   Rule 32(d) outlines four categories of objections: (1) objections to the notice; (2) objections to the officer's qualifications; (3) objections to the taking of the deposition; and (4) objections to the completing and returning the depositions. Fed. R. Civ. P. 32(d).  It appears that the latter three categories of objections address the objection asserted by Attorney Faulkner.  Since Attorney Faulkner has not responded to the Court's order to brief her objection and whether such objection has been waived, the Court will analyze all three categories of objections.

Under Rule 32(d)(2), "[a]n objection based on disqualification of the officer before whom a deposition is to be taken is waived if not made: (A) before the deposition begins; or (B) promptly after the basis for disqualification becomes known or, with reasonable diligence, could have been known."  Fed. R. Civ. P.

32(d)(2).  It appears that this objection is aimed at the qualifications of the Court reporter rather than the qualifications of an interpreter.  See Fed. R. Civ. P. 28 ("a deposition must be taken before: (A) an officer authorized to administer oaths either by federal law or by the law in the place of examination; or (B) a person appointed by the court where the action is pending to administer oaths and take testimony."); *see also Allen v. Figuera*, 416 Fed. Appx. 771, 774-75 (10th Cir. 2011) (holding that objection under Rule 32(d)(2) waived where "Allen was told at the beginning of his deposition that the court reporter was certified in Kansas rather than Colorado, *see* Fed. R. Civ. P. 28(a)(1)(A), he waited until after the deposition was completed and the cost of the deposition incurred before registering his objection.").

Even if Rule 32(d)(2) did apply to interpreters, Attorney Faulkner did not timely object before the deposition began or promptly after the basis for disqualification became known, or with reasonable diligence, could have been known.  Attorney Faulkner waited eight months after the completion of the deposition to raise the objection to the interpreter at the evidentiary hearing on January 9, 2012.  Therefore Attorney Faulkner did not exercise reasonable diligence and accordingly any objection based on the disqualification of the officer before whom a deposition is to be taken has been waived under Rule 32(d)(2).

Under Rule 32(d)(3)(A), "[a]n objection to a deponent's competence—or to the competence, relevance, or materiality of testimony—is not waived by a failure to make the objection before or during the deposition, unless the ground for it

7

might have been corrected at that time."  Fed. R. Civ. P. 32(d)(3)(A).   However under Rule 32(d)(3)(B), "[a]n objection to an error or irregularity at an oral examination is waived if: (i) it relates to the manner of taking the deposition, the form of a question or answer, the oath or affirmation, a party's conduct, or other matters that might have been corrected at that time; and (ii) it is not timely made during the deposition."  Fed. R. Civ. P.32(d)(3)(B).  "Rule 32(d)(3) makes provision for objections as to the taking of a deposition.  It forces the parties to be alert at the examination and thus save time and confusion at the trial because of formal errors.  It distinguishes between objections of substance going to the admissibility of the testimony taken and formal objections to the form of the questions and the conduct of the examination." *Rosary-Take One Production Co. Ltd. Partnership v. New Line Distribution, Inc.*, No.89CIV.1905(CSH), 1996 WL 79328, at *1 (S.D.N.Y. Feb. 23, 1996).  The purpose of Rule 32(d)(3)(B) is therefore "to give the inquiring attorney an opportunity to cure the defect" at the time of the deposition.  *Id.* at 2.

Accordingly any objection relating to the manner of the taking of the deposition must be made contemporaneously during the deposition and not at the conclusion or sometime thereafter.  *See e.g., Golden v. Merrill Lynch & Co., Inc.*, No. 06civ2970(RWS), 2007 WL 4299443, at *10 (S.D.N.Y. 2007) (holding that objection based on confusion or misunderstanding of the question was waived when it was not made contemporaneously during the deposition);  *Rosary-Take One Production Co. Ltd. Partnership*, 1996 WL 79328, at *2 ("It has been held that objections based upon a perceived unresponsiveness of the witness's answers

**8**

are waived absent objections made at the time of deposition") (citing *Kirschner v. Broadhead*, 671 F.2d 1034, 1037-38 (7th Cir. 1982)).  Here an objection to the qualifications of the interpreter could be construed as an objection based on the manner of the taking the deposition and therefore should have been made prior to the conclusion of the deposition.  *See Raya v. Maryatt Inds. Corp.*, No. C884276MHP, 1993 WL 515878 at *8n.3 (N.D. Cali. 1993) (holding that objection to the admissibility of a deposition based on poor translation which was made "after the deposition was over and the interpreter had left the building" was waived pursuant to Fed. R. Civ. P. 32(d)(3)(B)).  To allow such an objection to be made until after the deposition has been concluded would frustrate the purpose of Rule 32(d)(3)(B) since it deprived the inquiring attorney of the ability to cure the defect.  Accordingly, since Attorney Faulkner waited until after the deposition had concluded to question the qualifications of the interpreter and until the evidentiary hearing to object to the deposition testimony any objection to the manner of taking the deposition or the form of a question or answer has been waived under Rule 32(d)(3)(B).  Further Mona Menard's son brought her to and picked her up after the deposition.  Therefore, Attorney Faulkner had at her disposal a person who could have assisted.  Having failed to affect this cure, she waived the objection.

Under Rule 32(d)(4), "[a]n objection to how the officer transcribed the testimony—or prepared, signed, certified, sealed, endorsed, sent, or otherwise dealt with the deposition—is waived unless a motion to suppress is made promptly after the error or irregularity becomes known or, with reasonable

diligence, could have been known."  Fed. R. Civ. P. 32(d)(4).  Again, it would appear that Rule 32(d)(4) primarily applies to court reporters and not interpreters. However to the extent that it does apply to interpreters Attorney Faulkner has waived any such objection as she has not filed a motion to suppress.  In addition, even if she were to file a motion to suppress now over eight months after the deposition has concluded such motion would be untimely as it would not have been made promptly after the error or irregularity became known or with reasonable diligence could have been known.  S*ee D'Agostino v. Housing Authority of City of Waterbury*, No.3:05cv01057(PCD), 2006 WL 3388403, at *1n.2 (D.Conn. Nov. 20, 2006) (holding that "by failing to raise this issue earlier, however, Plaintiff has waived the ability to object to taking of his deposition and the ability to correct any allegedly inaccurate testimony" where Plaintiff objected to the court's consideration of his deposition testimony on summary judgment based on the defendant's failure to provide an Italian translator at the deposition). Since Attorney Faulkner waited until after the deposition had concluded to question the qualifications of the interpreter, until the evidentiary hearing to object to the deposition testimony, and has failed to file a motion to suppress any such objection has been waived under Rule 32(d)(4).

In addition under Rule 30(e) "[o]n request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which: (A) to review the transcript or recording; and (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making

**10**

them." Fed. R. Civ. P. 30(e).  Here, Plaintiff never requested to review the transcript nor provided an errata sheet correcting any error to the form of substance of the deposition transcript and therefore has waived her right to do so since more than 30 days has elapsed since she was notified that the transcript was available.  *Calloway v. Marvel Entertainment Group*, 110 F.R.D. 45, 52 (S.D.N.Y. 1986) (defendant waived right to object to alleged errors in deposition transcript by waiting six months to return errata sheet as a "six-month delay in returning such an errata sheet is inappropriate in view of the requirements of Rule 30(e), Fed. R. Civ. P., which requires the signature of the witness together with any changes in form or substance to be made within thirty days of its submission.  Noncompliance with this rule should be taken as a waiver of the right to examine and read the transcript.  The delay can also be deemed a waiver of the defendant's right to object to alleged errors in the transcript because they were not raised 'with reasonable promptness after such defect is, or with due diligence might have been ascertained.'") (quoting Fed. R. Civ. P. 32(d)(4)).

Under either three categories of permissible objections outlined in Rule 32 or pursuant to Rule 30(e)'s provisions for review of the deposition transcript, Attorney Faulkner has waived any such objections by waiting until the conclusion of the deposition to interrogate the credentials of the interpreter and by waiting until the January 9, 2012 evidentiary hearing to formally object to the admissibility of the deposition testimony.  Indeed, immediately after the deposition had concluded Attorney Faulkner was on notice that there could have been errors in the testimony due to the use of the interpreter and had the ability

to address those errors then.  Attorney Faulkner had ample opportunity to assess whether the interpreter was unqualified and whether the interpreter made any actual errors which she failed to take advantage of and therefore any objections raised months after the deposition concluded have been waived.

The Court notes that under the Federal Rules of Criminal Procedure, designed to protect fundamental constitutional guarantees, objections to an interpreter are waived unless made contemporaneously with the testimony.  *See* Fed. R. Crim. P. 15(f); *U.S. v. Lee*, No,99-1098,1999 WL 1024665, at *1 (2d Cir. Nov. 1, 1999) (finding that "appellant waived any objection as to the adequacy of the interpreters.  Although appellant complained of problems with the interpreters' interpretation at certain points during his testimony- *e.g.,* when the district court 'caught [him] with an inconsistent statement,' and when the government pressed him on a question that contradicted his prior testimony-appellant never formally objected to the use of the particular interpreters, did not move for a mistrial based on the inadequacy of the interpreters, and ultimately withdrew a motion for a new trial that did assert such an inadequacy."); *U.S. v. Gomez*, No.00-50344, 2001 WL 274309, at *1 (5th Cir. Feb. 13, 2001) (finding that district court did not err in "admitting at trial the deposition testimony of the illegal aliens on the ground that the translator provided at the deposition was not certified and translated the testimony incorrectly" as the "objection was waived due to lack of a contemporaneous objection" and noting that appellant also failed to demonstrate that the translator made any actual errors) (citing Fed. R. Crim. P. 15(f)).  The Federal Rules of Civil Procedure follow the same approach as the Federal Rules

of Criminal Procedure in that the rules require that objections to translation be made contemporaneously or prior to translation.  The Federal Rules of Criminal Procedure generally afford greater protection to criminal defendants in light of the constitutional implications of their testimony.  It is therefore unsurprising that the Federal Rules of Civil Procedure follow the same approach and do not permit objections to be made after the testimony has concluded and require that objections be made contemporaneously or prior to the translation.

At the evidentiary hearing, Attorney Faulkner suggested that the sole basis for her objection was that the interpreter was not certified.  Assuming she had briefed her objection as ordered by the Court and objected on this basis, such an objection would be unavailing.  Under the Court Interpreters Act, 28 U.S.C §1827, the "Director of the Administrative Office of the United States Courts shall establish a program to facilitate the use of certified and otherwise qualified interpreters in judicial proceedings instituted by the United States."   In addition, under 28 U.S.C §1828(a), the "Director of the Administrative Office of the United States Courts shall establish a program for the provision of special interpretation services in criminal actions and in civil actions initiated by the United States … in a United States district court."

Although 28 U.S.C §1827 and 28 U.S.C §1828(a) are expressly limited to proceedings brought by the United States, 28 U.S.C §1828(b) could potentially be read to apply to the provisions under 28 U.S.C §1827 and 28 U.S.C §1828(a) to private civil litigants.  28 U.S.C §1828(b) provides "[u]pon the request of any person in any action for which special interpretation services established

pursuant to subsection (a) are not otherwise provided, the Director, with the approval of the presiding judicial officer, may make such services available to the person requesting the services on a reimbursable basis at rates established in conformity with section 9701 of title 31, but the Director may require the prepayment of the estimated expenses of providing the services by the person requesting them."

Assuming without deciding that 28 U.S.C §1827 and 28 U.S.C §1828(a) do apply to private litigants, defendants "do not have an automatic right to an interpreter…rather a defendant is only statutorily entitled to the appointment of an interpreter if the district court determines that the defendant: (1) speaks only or primarily a language other than the English language; and (2) this fact inhibits their comprehension of the proceedings or communication with counsel." *U.S. v. Johnson*, 248 F.3d 655, 661 (7 th Cir. 2001).  Further, 28 U.S.C.A. §1827(b) provides that the services of otherwise qualified interpreters may be used "when no certified interpreter is reasonably available, as determined by the presiding judicial officer."

Here neither the deponent nor Attorney Faulkner informed defense counsel that an interpreter was needed nor did they provide one.  The parties were assembled for the deposition when they became aware of the need for an interpreter.  Defense counsel called an interpreter service which sent an interpreter to the deposition.  Assuming that 28 U.S.C. §1827 did apply to this proceeding, it is clear that a certified translator under these circumstances was not reasonably available and therefore it was entirely appropriate to employ the

**14**

services of an otherwise qualified interpreter.  *See U.S. v. Paz*, 981 F.2d 199, 200-01 (5th Cir. 1992) (finding that district court did not abuse its discretion by providing a qualified but not certified translator and noting that defendant did not give the district court the opportunity to demonstrate that (or determine whether) a certified Spanish translator was not reasonably available because [defendant] failed to object to the interpreter provided").

In addition, the Administrative Office of the Unites States Courts certifies translators for use in federal district courts.[2]  There are no Administrative Office certified Haitian Creole interpreters that reside in Connecticut nor are there any language skilled or professionally qualified Haitian Creole interpreters that reside in Connecticut.  In fact, there are only seven Haitian Creole interpreters certified by the Administrative Office for all Unites States district courts who reside in New York, California, Massachusetts, Haiti, and Florida.  Accordingly, even if Attorney Faulkner had insisted prior to the deposition on the use of a certified Haitian Creole translator none were reasonably available within the District of Connecticut and therefore under the Court Interpreters Act the services of an otherwise qualified interpreter may be used.

Furthermore, the Court Interpreters Act was "enacted to mandate the appointment of interpreters under certain conditions and to establish statutory guidance for the use of translators to ensure that the quality of the translation does not fall below a constitutionally permissible threshold."  *Johnson*, 248 F.3d at 661 (internal quotation marks and citation omitted).  "Congress enacted that

---

[2]  *See* http://www.ctd.uscourts.gov/court_interpreter.html (last visited March 15, 2012)

statute to ensure that a defendant has comprehension of the proceedings and can effectively communicate with counsel.  The certification process serves as a safeguard to guarantee that the court interpreter is competent.  However, the court may select an otherwise qualified interpreter if no certified interpreter is reasonably available." *Paz*, 981 F.2d at 200.  Here Plaintiff does not contend that the interpreter did not faithfully and accurately translate what was said at the deposition such that Mona Menard could not comprehend the proceedings or communicate with counsel.   Plaintiff thereby does not allege that the quality of translation fell below any constitutional or other applicable threshold.

Although the Court Interpreters Act speaks in mandatory terms as to the duty of the judiciary to establish a program for the provision of interpreter services to protect defendants whose primary language is not English, the Act does not preclude a defendant from waiving the right to receive translation services nor precludes him from waiving objections to certification or performance of translator.  See 28 U.S.C. § 1827 (""[a]ny individual other than a witness who is entitled to interpretation under subsection (d) of this section may waive such interpretation in whole or in part"); *see also U.S. v. Huang*, 960 F.2d 1128, 1135-36 (2d Cir. 1992) ("Objections to adequacy of translation may be waived and the ultimate question is whether the translator's performance has rendered the trial fundamentally unfair") (citation omitted).  Plaintiff's failure to disclose her need for an interpreter prior to the scheduled deposition arguably constituted a waiver of assertion that she was entitled to have a certified translator.  There is no claim that Menard was inhibited from communicating with

counsel or that the interpreter did not accurately translate the proceeding. Plaintiff has failed to demonstrate that the translator's performance rendered the deposition fundamentally unfair.

In addition, Plaintiff and her counsel could have made arrangements to have an interpreter of their choice available if they had elected to notify defense counsel ahead of time of the need for an interpreter and jointly agree to the use of a specific interpreter for the scheduled deposition.  Moreover, Plaintiff's son who brought her to the deposition could have remained and assisted with translation during the deposition.  Although Plaintiff could have likely made arrangements to have an interpreter of her choice, a plaintiff in a civil action is not entitled to have an interpreter of her choice present at a deposition.  *See Malpico v. Newman Mach. Co., Inc.*, 107 F.Supp.2d 712, 714 (W.D.Va. 2000) (finding that the plaintiff was permitted to only have an interpreter of his own choice remain outside of the deposition room to aid the plaintiff "when absolutely necessary" and was not allowed to have the interpreter present at the deposition since "it [wa]s not impossible for the official interpreter to communicate with the plaintiff").

For the foregoing reasons, the Court finds that any objection to the interpreter has been waived and will consider the deposition testimony of Mona Menard offered into evidence at the evidentiary hearing.

### Findings of Fact

Based on the testimonial and documentary evidence introduced at the evidentiary hearing the Court finds the following facts to have been established by clear and convincing evidence.

Attorney Faulkner personally communicated with Mona Menard's sons Jean and Josue Menard on numerous occasions during the course of the litigation.  Attorney Faulkner was aware that Mona Menard lived with her son(s).  Attorney Faulkner was also aware that Mona Menard had limited English skills but was unaware of the extent of her limitations.

On July 23, 2009, Attorney Faulkner filed the complaint in the instant matter on behalf of Mona Menard before she had communicated in person or otherwise with Mona Menard.  Attorney Faulkner had only communicated with Mona Menard's son(s) prior to filing the complaint.

Attorney Faulkner never asked Jean or Josue Menard if either had power of attorney for Mona Menard.   Attorney Faulkner did not see a power of attorney for Mona Menard from either Jean or Josue Menard.   Attorney Faulkner did not seek or obtain any documentation from Jean or Josue Menard which authorized either of them to speak or act on behalf of their mother.  Attorney Faulkner never had a conversation with Mona Menard prior to her deposition.  Mona Menard did not tell Attorney Faulkner that either of her sons was authorized to speak or act on her behalf.

Indeed, the first time Attorney Faulkner met Mona Menard in person or spoke with her personally was at her deposition on April 21, 2011 which was conducted in connection with Attorney Faulkner's fee application.

Although Attorney Faulkner's first in person communication with Mona Menard occurred on April 21, 2011, Attorney Faulkner testified that her first attempt at "direct communication" with Mona Menard was a letter dated July 27,

2009 sent by U.S. mail from Attorney Faulkner addressed to Mona Menard at the address where she resided with her son(s) (hereinafter the "Menard Residence"), in which Attorney Faulkner enclosed a copy of the complaint she had filed and outlined her attorney fee policy. *See* Def. Ex. C.  This admittedly first attempt at "communication" from Attorney Faulkner addressed to Mona Menard and sent to the Menard Residence was mailed four days after Attorney Faulkner filed the complaint initiating the instant matter on July 23, 2009.   In this letter, the complaint is enclosed and all other communications between Faulkner and Menard were in English devoid of any translation other than the translation made by Defendant's interpreter at Menard's deposition.

Attorney Faulkner did not obtain from Mona Menard any written acknowledgment regarding her representation in the instant action.   Mona Menard never signed a retainer agreement or letter in connection with Attorney Faulkner's services nor did Mona Menard respond to Attorney Faulkner's letter dated July 27, 2009.

Attorney Faulkner sent several letters addressed to Mona Menard at the Menard Residence in the mail during the course of the litigation.  For example, Attorney Faulkner sent a letter dated July 12, 2009, addressed to Mona Menard in which she indicated that the Defendant had offered to settle for $1000 and to pay attorney fees and costs of $2500.  *See* Court's Exhibit 1.   In the letter, Attorney Faulkner recommended rejecting the offer because her fees were in excess of $7500 and therefore pursuant to Attorney Faulkner's attorney fee policy she

would keep the $1000 as payment towards her attorney fees.  *Id.*  Mona Menard did not respond to this either.

Attorney Faulkner twice received correspondence in the mail from the Menard Residence during the course of the litigation.  First, Attorney Faulkner sent a letter addressed to Mona Menard requesting that Mona Menard provide her with certain documents that had been requested by Defendant during discovery.  Attorney Faulkner received in the mail the requested documents bearing the Menard Residence's address.  Second, Attorney Faulkner sent to the Menard Residence's address a document entitled "Plaintiff's Affirmation" seeking Mona Menard's signature on the document.   Attorney Faulkner received a copy of the document entitled "Plaintiff's Affirmation" with the signature of Mona Menard in an envelope bearing the Menard Residence's return address.  A copy of the signed "Affirmation" was filed in support of Plaintiff's motion for summary judgment. *See* [Dkt. #23, Attach 2].

Although in the "Affirmation" it states that "I make this affidavit in support of my motion for summary judgment," the "Affirmation" was not signed and sworn to in the presence of a notary public or other person authorized to administer oaths as required under Local Rule 56.  Local Rule 56 provides that "[a]n affidavit is a sworn statement by a witness that the facts contained in the affidavit are true to the best of the witness's knowledge and belief.  To be considered by the Court, an affidavit must be signed and sworn to in the presence of a notary public or other person authorized to administer oaths."

Attorney Faulkner does not have personal knowledge that Mona Menard herself sent the documents responsive to Defendant's discovery requests and the signed "Affirmation" to Attorney Faulkner. Attorney Faulkner testified that she assumed the responses were from Mona Menard because the envelopes containing this correspondence bore the Menard Residence's return address.

Attorney Faulkner further testified at the hearing that she sent a letter addressed to Mona Menard informing her that Defendant had noticed her deposition and that Mona Menard responded to her letter by appearing for the deposition. Mona Menard's son Josue Menard brought her to the deposition but was not present during the deposition.

Lastly, Attorney Faulkner testified that she believed that Mona Menard's sons were acting with the permission of Mona Menard and that she believed that she was representing Mona Menard. She testified that Mona Menard's sons had indicated to her that they had the consent, permission and authority of their mother Mona Menard. Attorney Faulkner sent a check in the amount of $1001 in satisfaction of the stipulated judgment to the Menard Residence in an envelope bearing Mona Menard's name as addressee.

Mona Menard testified in her deposition that she was not aware that she was a plaintiff in a lawsuit. *See* Def. Ex. A, Menard Dep. at p. 20. She testified that she was not aware that she had sued Attorney Benjamin. *Id.* Mona Menard also testified that she never had a conversation with Attorney Faulkner before her deposition nor had she met Attorney Faulkner before her deposition. *Id.* at 25. She testified that she did not know if Attorney Faulkner is representing her as a

lawyer and that she has never had "any communications, whether spoken or in writing, with Miss Faulkner in connection with her acting as [her] lawyer." *Id.* at 25-26.

Mona Menard testified that she had not paid Attorney Faulkner "any monies in connection with legal representation" nor had Attorney Faulkner ever paid to her or provided her with any monies. *Id.* at 26.  In addition, Mona Menard indicated that she does not have any obligation to pay Attorney Faulkner any monies nor does "Attorney Faulkner under any circumstances have any obligation to pay any monies" to her. *Id.*  She testified that she did not know if "Attorney Faulkner under any circumstances ha[d] any obligation to forward [her] monies collected in connection with a lawsuit against Attorney Benjamin Morris." *Id.* at 26-27.

Mona Menard further testified that she did not know if "Attorney Faulkner ever provided [her] with any documents whatsoever in connection with any legal matter in which [she] was a party" nor was she aware of "whether Attorney Faulkner has ever provided her with any document in connection with any legal matter." *Id.* at 27.  She further testified that she never had a conversation with Attorney Faulkner and that she does not know Attorney Faulkner. *Id.* at 28.

In addition, Mona Menard testified that she had not given anybody a power of attorney to act on her behalf and that she had never "authorized or permitted another person to act on [her] behalf in connection with Attorney Faulkner." *Id.* She further testified that Attorney Faulkner had never contacted her via email, correspondence or by letter. *Id.* at 29.

Lastly, Mona Menard testified that she had never had any communications with Benjamin Morris nor did she know who Benjamin Morris was.  *Id.*  She further testified that Benjamin Morris has never harmed her in any way.  *Id.*

Legal Standard

The "standard to prove fraud on the court is extremely high, and relief under Rule 60(d) is narrower in scope than that which is sufficient for relief by timely motion under Rule 60(b)(3)." *Lee v. Marvel Enterprises, Inc.*, 765 F.Supp.2d 440, 450 (S.D.N.Y. 2011) (internal quotation marks and citation omitted).  In addition, "[u]nlike fraud under Rule 60(b)(3), fraud of the court is limited to fraud that seriously affects the integrity of the normal process of adjudication.  Fraud upon the court embraces only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Id.* (internal quotation marks and citations omitted).  "This is because Rule 60(d) actions are warranted only when necessary 'to prevent a grave miscarriage of justice.'"  *LinkCo, Inc. v. Naoyuki Akikusa*, 367 Fed.Appx. 180, 182 (2d Cir. 2010) (quoting *United States v. Beggerly*, 524 U.S. 38, 47 (1998)).  Fraud on the court "involves far more than an injury to an individual litigant or a case of a judgment obtained simply with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury." *Transaero, Inc. v. La Fuerza Area Boliviana*, 24 F.3d 457, 460 (2d Cir. 1994) (internal quotation marks omitted).  Fraud on the court "will apply to conduct that might be thought to corrupt the judicial process itself, as where a party bribes a

judge or inserts bogus documents into the record." *Weldon v. U.S.*, No.99-6142, 2000 WL 1134358, at *2 (2d Cir. Aug. 9, 2000) (internal quotation marks and citation omitted).

"In order to succeed on a Rule 60(d) motion, fraud upon the court must be established by clear and convincing evidence." *Lee*, 765 F.Supp.2d at 450 (internal quotation marks and citation omitted). The Second Circuit has emphasized that "the fraud on the court rule … should be characterized by flexibility and an ability to meet new situations demanding equitable intervention." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1988) (internal quotation marks and citation omitted).

<u>Analysis</u>

Based on the testimonial and documentary evidence introduced at the evidentiary hearing the Court finds by clear and convincing evidence that Mona Menard had never authorized the initiation of a lawsuit against Benjamin Morris and had never engaged Attorney Faulkner to represent her in such litigation. The Court further finds that Mona Menard's sons Jean and Josue Menard perpetrated a fraud upon the Court when they engaged without authorization Attorney Faulkner to pursue litigation in the name of their mother Mona Menard unbeknownst to her. Mona Menard had never heard of Attorney Faulkner, had never communicated with Attorney Faulkner, was not aware that a lawsuit had been brought in her name, and did not receive the $1001 dollars that Attorney Faulkner had recovered from Benjamin Morris pursuant to the stipulated judgment. Attorney Faulkner had only communicated with Jean and Josue

Menard and admittedly filed the complaint in the matter prior to having any type of communication with Mona Menard whatsoever and only mailed correspondence addressed to Mona Menard at the residence she shared with her sons after filing suit in her name.

Jean and Josue Menard therefore fraudulently caused a lawsuit in which they had no standing or authority to bring against Benjamin Morris.  Jean and Josue Menard's fraudulent conduct is the type of conduct that Rule 60(d) covers in that it seriously affects the integrity of the normal process of adjudication and attempts to defile the Court itself.  It is undoubtedly a corruption of the judicial process itself for an individual who has no standing to cause an action to be filed on behalf of another individual who has standing without that individual's authorization and knowledge.  Jean and Josue Menard's fraudulent conduct is therefore a corruption of the bedrock principle of the Court's jurisdictional standing requirement.  *See Raines v. Byrd*, 521 U.S. 811, 818-19 (1997) ("'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.' ... We have always insisted on strict compliance with this jurisdictional standing requirement.") (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26,37 (1976)).  Since Jean and Josue Menard cannot meet the Article III standing requirement that they have a personal stake in the alleged dispute and that the alleged injury is particularized to them, the Court has no jurisdiction to adjudicate a claim brought by Jean or Josue Menard directly against Benjamin Morris.  *See Lujan v. Defenders of Wildlife*, 50 U.S. 555, 561

(1992).  Consequently, Jean and Josue Menard, by causing the action to be filed in the name of Mona Menard, were able to fraudulently evade the foundational jurisdictional bar to bringing suit directly against Benjamin Morris on their own behalves.  Such fraud seriously undermines the integrity of the normal process of adjudication and is properly the subject of a Rule 60(d) motion.

Jean and Josue Menard's conduct also abused the judicial process itself by fraudulently causing a stipulated judgment to be entered by the Court on Mona Menard's behalf pursuant to which the Court had the authority and power to enforce the judgment against Benjamin Morris.  "As a general rule, once a federal court has entered judgment, it has ancillary jurisdiction over subsequent proceedings necessary to vindicate its authority and effectuate its decrees.  This includes proceedings to enforce the judgment."  *Dulce v. Dulce*, 233 F.3d 143, 146 (2d Cir. 2000) (citations omitted).  Accordingly, Jean and Josue Menard's conduct involved far more than an injury to an individual litigant and resulted in defilement and abuse of the Court's authority thereby corrupting the judicial process itself.

Attorney Faulkner argues that she did have an attorney-client relationship with Mona Menard.  The Second Circuit has held that the relationship between a lawyer and client is one of agent and principal and "actual authority may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act."  U.*S. v. Int'l Bhd. of Teamsters,* 986 F.2d 15, 20 (2d Cir. 1993) (internal quotation marks and citations omitted).  "In a case

arising under federal law, the scope of an agent's authority is determined according to federal precedent." *Id.*

In the Second Circuit there is "no single, well-defined test used to determine whether an attorney-client relationship exists; rather, a court must weigh a number of factors, including among others: (1) whether a fee arrangement was entered into or a fee paid; (2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; and (3) whether the purported client believes that the attorney was representing him and whether this belief is reasonable." *DeVittorio v. Hall*, No.07Civ.0812(WCC), 2007 WL 4372872, at *7 (S.D.N.Y. Dec. 12, 2007) (citation omitted). In addition, courts "have consistently rejected the argument that indicia of a formal relationship are necessary. Most courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice." *Fierro v. Gallucci*, No.06-CV-5189*JFB), 2007 WL 4287707, at *6 (E.D.N.Y. Dec. 4, 2007) (internal quotation marks and citation omitted). The Second Circuit has stated that "[t]he key, of course, to whether an attorney/ client relationship existed is the intent of the client and whether he reasonably understood the conference to be confidential." *Unites States v. Dennis*, 843 F.2d 652, 657 (2d Cir. 1998).

Although since this case arises under federal law, federal precedent governs the analysis of whether an attorney-client relationship exists, the Court recognizes that Connecticut state law's interpretation is similar to the factors

used by courts in the Second Circuit to determine whether an attorney-client relationship exists.  *See Matthews v. Lynch*, No.3:07CV739(WWE), 2009 WL 2407363, at *4 (D. Conn.  Aug. 6, 2009) (noting that under Connecticut law an attorney-client relationship "'is established when the advice and assistance of the attorney is sought and received in matters pertinent to his profession'" and "'Evidence of either a retainer agreement or a contract between the parties is relevant to the determination of [the relationship's] existence.'") (quoting *DiStefano v. Milardo*, 276 Conn. 416, 433 (2005); *Solomon v. Aberman*, 196 Conn. 359, 384 (1985)).

Here, it is beyond doubt that Mona Menard did not believe that Attorney Faulkner was representing her and that Mona Menard had never agreed to nor even seen the fee arrangement letter that Attorney Faulkner sent by U.S. mail to the Menard Residence after she filed the complaint initiating the instant matter. There was no written contract or retainer agreement signed by Mona Menard in which Attorney Faulkner accepted representation.  Since Mona Menard was not aware who Attorney Faulkner was, Mona Menard could not have intended to engage Attorney Faulkner to represent her in an action against Benjamin Morris. Mona Menard, herself, did not engage in any conduct or words which would indicate to Attorney Faulkner that she was to file and prosecute an action against Benjamin Morris.  Instead, Attorney Faulkner's belief that Mona Menard had authorized her to prosecute the matter was entirely based on Jean and Josue's fraudulent conduct.  In addition, the factors used by courts in the Second Circuit to determine whether an attorney-client relationship existed all focus on the

client's beliefs and conduct as opposed to the lawyer's beliefs.  Accordingly, Attorney Faulkner's belief that correspondence she sent to the Menard Residence addressed to Mona Menard was received, read, understood, and replied to by Mona Menard and that on the basis of this correspondence she had authority from Mona Menard is not dispositive as to whether an attorney-client relationship existed between Mona Menard and Attorney Faulkner.

Attorney Faulkner also argues that the Court should presume that she had authority to prosecute the case on behalf of Mona Menard since she was the attorney of record in the action.   Attorney Faulkner points to Second Circuit authority which holds that "because of the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements, we presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so." *In re Artha Management, Inc.*, 91 F.3d 326, 329 (2d Cir. 1996); *see also Int'l Bhd.*, 986 F.2d at 20.  This is a non-sequitur.  Attorney Faulkner's reliance on such precedent is misplaced as this line of precedent focuses on whether the attorney of record had authority to bind his or her client to a particular settlement agreement as opposed to whether the attorney of record had authority from his or her client to prosecute the action from the outset.  Here, Defendant Morris is not simply challenging Attorney Faulkner's authority to settle the case but instead expressly and unequivocally stated that Attorney Faulkner had no authority to file or prosecute the action on her behalf from the outset.

To the extent this caselaw is relevant, the Second Circuit has held that "any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *In re Artha Management, Inc.*, 91 F.3d at 329.  Here, Defendant Morris has more than carried the burden of proving by affirmative evidence that Attorney Faulkner lacked authority to settle the action.   As discussed above, Defendant Morris has provided affirmative evidence that Attorney Faulkner lacked authority to initiate the action on behalf of Mona Menard to begin with nevertheless settle the action.

Lastly although the Court finds that Attorney Faulkner did believe she had authority to bring and prosecute this action on behalf of Mona Menard and that Attorney Faulkner's belief was based on Jean and Josue Menard's fraudulent conduct, the Court notes that Attorney Faulkner had no reasonable basis to believe she represented Mona Menard.  Indeed, she had a professional obligation to look towards Mona Menard, herself, and not to her sons with respect to the litigation.  Under the Connecticut Rules of Professional Conduct which have been adopted in this District,[3] Rule 1.14 (a) provides that "[w]hen a client's capacity to make or communicate adequately considered decisions in connection with a representation is impaired, whether because of minority, mental impairment, or for some other reason, the lawyer shall, as far as reasonably possible, maintain a

---

[3] The Connecticut Rules of Professional Conduct have been adopted in this District pursuant to Local Rule 83.2.  *See* Local Rule 83.2 ("this Court recognizes the authority of the 'Rules of Professional Conduct,' as approved by the Judges of the Connecticut Superior Court as expressing the standards of professional conduct expected of lawyers practicing in the District of Connecticut.").

normal client-lawyer relationship with the client." *See* CT Rules of Prof. Conduct R. 1.14(a).  The Commentary to Rule 1.14 explains that the "fact that a client suffers a disability does not diminish the lawyer's obligation under these rules. Even if the person has a legal representative, the lawyer should as far as possible accord the represented person the status of client, particularly in maintaining communication." Rule 1.14 Commentary ¶2. The Commentary further provides that:

> The client may wish to have family members or other persons participate in discussions with the lawyer.  When necessary to assist in the representation, the presence of such persons generally does not constitute a waiver of the attorney–client evidentiary privilege. Nevertheless, the lawyer must keep the client's interests foremost and . . . must look to the client, and not family members, to make decisions on the client's behalf.

*Id.* at ¶4.

Assuming that Mona Menard had been aware of and consented to the filing of the lawsuit in the first instance, her capacity to communicate was arguably impaired by her limited English skills.  Further, Attorney Faulkner had been made aware by Jean and Josue Menard that Mona Menard had limited English skills. Under Rule 1.14, Attorney Faulkner had a professional obligation to not defer to Jean and Josue Menard and instead be heedful to communicate personally and directly with Mona Menard.  The Court questions whether correspondence written in English, addressed to Mona Menard and sent by U.S. mail to an address where Mona Menard resided with her son(s) satisfies an attorney's professional obligation to look to the client and not to family members to make decisions on the client's behalf.  The Court further questions whether this obligation was satisfied at the outset of the action when Attorney Faulkner filed the complaint on

Mona Menard's behalf prior to sending any correspondence by mail to the Menard Residence and only after conversing with her son(s).

<u>Conclusion</u>

For the foregoing reasons, the Court finds that the Joint Stipulation for Judgment in favor of Plaintiff Mona Menard must be set aside for fraud on the Court.  [Dkt. ## 35 and 36].   The Court therefore GRANTS Defendant's motion to vacate the judgment.  [Dkt. #63].  Since Mona Menard had not authorized the initiation of a lawsuit against Benjamin Morris nor consented to Attorney Faulkner's representation of her in the action, the Court dismisses the action *ab initio*.  The Clerk is directed to vacate the stipulated judgment [Dkt. ## 35 and 36] and close the file.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 15, 2012